UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOMINIC GWINN,<br>      Plaintiff<br><br>    v.<br><br>CITY OF CHICAGO, *et al.*,<br>      Defendants | No. 23 CV 1823<br><br>Judge Jeremy C. Daniel |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on cross-motions for summary judgment. The plaintiff, Dominic Gwinn, accuses the defendants, the City of Chicago ("the City") and Chicago Police Superintendent David Brown, of infringing his copyright in a 102-second-long video ("the Work") of a protest involving the Chicago Police Department ("CPD"). Gwinn further alleges the City removed Copyright Management Information ("CMI") that conveyed in connection with the Work. The defendants do not dispute that they copied the Work, but assert the affirmative defense of fair use. They also deny removing Gwinn's CMI. The Court, for the reasons detailed below, finds that the defendants did not make fair use of Gwinn's Work, and that the City did remove CMI from the Work.

# BACKGROUND[1]

The following facts are undisputed unless otherwise noted.[2] Gwinn works as a freelance photojournalist. (R. 50, (Defendants' Response to Plaintiff's Statement of Additional Material Facts ("Defs.' Resp. PSOAF") ¶ 1.)[3] He makes his living licensing his footage and pictures of current events to third parties, including news organizations. (*Id.* ¶ 2.) On June 17, 2020, Gwinn filmed the Work, a 102-second-long video of protestors assaulting CPD officers near the Christopher Columbus statue in Grant Park. (R. 48 (Plaintiff's Response to Defendants' Statement of Facts ("Pl.'s Resp. DSOF")) ¶¶ 1, 4.) The Work captures protestors throwing canned beverages, PVC pipes, and fireworks at the police. (*Id.*)

Gwinn then posted the Work to his Twitter account. (*Id.* ¶ 5.) Over the next three days, several news organizations reached out to Gwinn about licensing the Work; he refused to do business with some but offered several other news organizations a "standard rate" of $250, with no takers. (*Id.* at ¶¶ 8–12.)

On June 20, 2020, Brown, then-Superintendent of the CPD, held a press conference to "to inform the news media and public of the public safety issues and actions taken against CPD officers during the protest at Grant Park." (*Id.* ¶ 13.) As

---

[1] The following facts are taken from the parties' L.R. 56.1 Statements, the materials cited therein, and other aspects of the record in this case.

[2] The defendants object that Gwinn's L.R. 56.1 Statements are non-compliant with the then-presiding Judge's standing orders and are unsupported by citation to evidence. While the defendants are technically correct, "whether to apply the [local rules or standing orders] strictly or to overlook any transgression[,]" however, "is [] left to the district court's discretion." *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011). As Gwinn's omissions did not interfere with the Court's ability to reach the merits of this case, the defendants' objections are overruled.

[3] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

2

part of this press conference, Brown played an approximately eight-minute-long compilation video comprised of several different recordings of the June 17th protest march and following altercation ("the Compilation"). (*Id.* ¶ 17.) The Compilation included ninety-seven seconds of Gwinn's Work in a single cut. (*Id.* ¶¶ 17, 33.)

The Compilation was made by the CPD's Bureau of Detectives (the "Bureau"). (*Id.* ¶ 54.) The Bureau obtained Gwinn's Work from Twitter and included it in the Compilation without permission from or attribution to Gwinn. (R. 43 (Defendants' Response to Plaintiff's Statement of Facts ("Defs.' Resp. PSOF")) ¶¶ 4–6; Pl.'s Resp. DSOF ¶ 56.)

The day after the press conference, CPD emailed various news outlets a link to download the Compilation. (Pl.'s Resp. DSOF ¶ 44.) The Compilation was also posted to the City's YouTube page, where it remained until Gwinn notified the City of his copyright claim. (*Id.* ¶ 52.) A copyright registration for the Work was issued on September 10, 2020, with an effective date of July 28, 2020. (*Id.* ¶ 50.)

Gwinn then sued the City and Brown for copyright infringement (Count I) and for removal of CMI (Count II). Now, the parties cross-move for summary judgment.

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is 'material' if it is one identified by the law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015) (citation omitted). A genuine dispute as to any material fact exists

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, the Court "construe[s] all facts and draw[s] all reasonable inferences in the nonmoving party's favor, but the moving party may prevail 'by showing an absence of evidence to support' the nonmoving party's claims." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Tyburski v. City of Chicago.*, 964 F.3d 590, 597 (7th Cir. 2020)). While the Court must give the nonmoving party "the benefit of reasonable inferences from the evidence," it does not construe "speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016). "Where, as here, the parties file cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made." *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017) (citing *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015)).

## ANALYSIS

### I. COUNT I: COPYRIGHT INFRINGEMENT

The defendants do not dispute that their actions constitute copyright infringement, but assert the affirmative defense of fair use. (R. 33 (Defendants' Statement of Facts ("DSOF")) ¶ 56; R. 32 at 5.) Accordingly, the Court's analysis of Count I collapses into a fair use analysis.

The owner of a copyright has the exclusive right, with certain exceptions, to reproduce the copyrighted work, and the exclusive right to prepare derivative works based on the work. 17 U.S.C. § 106. Chief among these exceptions is "fair use," the

4

principal that a copyright owner cannot stop others from making socially beneficial use of a copyrighted work in ways that do not harm the value of the copyright. 17 U.S.C. § 107. The Copyright Act sets out a four-part non-exclusive test for fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* "Some factors may prove more important in some contexts than in others." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 19 (2021).

Fair use is a mixed question of fact and law. *Id.* at 23–24. The individual elements, such as whether a use harmed a market for a work or how much of a work was copied, may be factual in nature, while the ultimate determination of whether a use of a work is fair is a question of law. *Id.* Where the material facts are not in dispute, courts can properly grant summary judgment on questions of fair use. *Id.*

### A. Factor One: Purpose and Character of the Use

The first fair use factor "considers the reasons for, and nature of, the copier's use of an original work." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527–28 (2023). The Court must determine whether the copier is superseding or supplanting the original, or adding "something new, with a further purpose or different character." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). While the Court in *Campell* defined this question as one of "transformative" use, a copier need not transform the work for the copying to be fair use. *See Google*,

5

593 U.S. at 32; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 (1984). In both *Google* and *Sony*, the Supreme Court found fair use even though the copying (11,500 lines of code, and entire TV programs, respectively) created exact duplicates of the copyrighted work. 593 U.S. at 32–33; 464 U.S. at 448–51. The focus of this analysis should be on the extent the "use at issue" differs from the "purpose and character" of the original. *Goldsmith,* 598 U.S. at 529. "The larger the difference, the more likely the first factor weighs in favor of fair use. The smaller the difference, the less likely." *Id.*

Here, the Work was created as news footage of the events of June 17, 2020. (R. 51 at 9.) Thus, its purpose and character was to inform an audience about the events it depicts. As the defendants concede, CPD and Brown used the Work to "inform, report, and provide official commentary" on the events depicted in the Work. (R. 32 at 4.). In other words, the Work exists to document and inform an audience about the factual events that occurred in Grant Park on June 17. CPD used the Work to inform an audience about the factual events in Grant Park on June 17. Therefore, the purpose and character of the Work is the same as the purpose and character of CPD's use of the Work.

The defendants attempt to differentiate the Work from the Compilation and news conference. They argue that the CPD was creating a new "aesthetic, message, and meaning" by juxtaposing the Work with other footage from June 17, adding graphics, and providing commentary as the Compilation was played at the press

6

conference. (*Id.* at 7.) Similar arguments have been rejected by courts across the nation when considering transformative use in news reporting.

In *Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997), the Ninth Circuit concluded that the rebroadcast of footage of the Rodney King Riots with an in-house voiceover was not transformative because the voiceover did not add "anything new or transformative to what made the [] work valuable—a clear, visual recording" of the events themselves. Similarly, courts have concluded where the contents of a photograph, and not the photograph itself, that is the story, it is not transformative to use that photograph in a news report. *See Fioranelli v. CBS Broad. Inc.*, 551 F. Supp. 3d 199, 234 (S.D.N.Y. 2021). This is because "[n]ewsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 406 n.6 (S.D.N.Y. 2016); *see also Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 185–86 n.2 (D. Mass. 2007) (cropping and embedding a photograph in a news story not transformative because "if such a minor adjustment was transformative in the fair use sense, then it is hard to imagine any use of archived imagery in news reporting that would not be fair use.")

The defendants cite *City of Inglewood v. Teixeira*, No. 15 C 1815, 2015 WL 5025839, at *8 (C.D. Cal. Aug. 20, 2015), to argue that overlaying a video with oral commentary and criticism can qualify as transformative fair use. However, *Teixeira* is very different from this case. In *Teixeira*, the defendant was making political

7

commentary about Inglewood's mayor and city council using footage of city council meetings. 2015 WL 5025839 at * 3. As such, the use was transformative because documentation of and commentary on city council meetings are fundamentally different. *Id* at *9. Here, the defendants were making factual commentary about the contents of a factual work. (R. 51 at 9; R. 32 at 7.) This use is not transformative compared to the use in *Teixeira*. And, as an aside, the copyright in *Teixiera* could not be enforced due to a law prohibiting California public entities from claiming copyright protection except in limited circumstances. 2015 WL 5025839 at *5–6. As such, *Teixeira* is not compelling to this Court on its own facts, let alone when read alongside *KCAL-TV, Fioranelli, BWP Media USA,* and *Fitzgerald*.

Instead, the Court is persuaded this case fits squarely in line with these four predecessors. The defendants' use of the Work was not due to the inherent newsworthy quality of Gwinn's presence or his video. Rather, the defendants used his video because of what it depicted—the events in Grant Park on June 17. As such, their use was not transformative and shared the character and purpose of the Work.

The defendants' other arguments on this factor do not move the needle appreciably. True, their use of the Work was non-commercial, and there is no evidence to suggest the defendants were not acting in good faith at the June 20 press conference. (R. 42 at 7–8.) Both these factors can weigh in favor of fair use. *See Google*, 593 U.S. at 32. But these are at best, marginal factors useful in close calls. *See Nimmer on Copyright* § 13F.05. This factor is not a close call. Gwinn created the Work

8

as news footage, to document the events in Grant Park; the defendants used the Work for precisely the same reason. Marginal factors are not needed here.

### B. Factor Two: The Nature of the Copyrighted Work

The second fair use factor considers what type of work is being copied. "In general, fair use is more likely to be found in factual works than in fictional works." *Stewart v. Abend*, 495 U.S. 207, 237 (1990). This is because there is a "greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 563 (1985).

Here, the nature of the Work weighs in favor of fair use. Gwinn concedes that "the Work by its nature is more factual than creative," (R. 47 at 9), which favors fair use. *See Stewart*, 495 U.S. at 237. The Court sees no reason to depart from this general rule here, and concludes that this factor favors fair use.

### C. Factor Three: The Amount of the Work Used

"The cases are clear that a complete copy is not *per se* an unfair use." *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 521 (7th Cir. 2002). The Court asks instead whether the copied material comes from the "heart" of the work's creative expression or whether the copying is "central to a . . . valid purpose." *Google*, 593 U.S. at 33. For example, selective quotation of a memoir's "dramatic focal points" was not fair use, *Harper*, 471 U.S. at 566, but taping a television program for later viewing was fair use, *Sony*, 464 U.S. at 455–56.

Here, the amount of the Work used weighs against a finding of fair use. The defendants used all but six seconds of Gwinn's footage. (Pl.'s Resp DSOF. ¶¶ 17, 33.) The uncopied footage consists of mostly unfocused shots, captured as Gwinn moved

9

away from the Columbus statue following a firework detonation. (R. 33-3 at 1:34–1:42.) The defendants argue that because they did not use the audio, and because the Work "forms only a small part of the longer Compilation and an even smaller part of the Press Conference," this factor weighs against fair use. (R. 42 at 9.) The defendants further argue that their purpose in copying the Work, to "facilitate news reporting of the attacks on CPD officers, provide CPD commentary regarding the Protest, and announce new requirements that officers must wear riot gear when protests occur," renders that copying fair use. (*Id.*) However, as previously explained, the purpose of the defendants' use does not favor fair use. Because the analysis of this factor "will harken back to the first of the statutory factors . . . the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87. Accordingly, some uses, different from the original underlying purpose of the work in question, will justify making a complete copy of the work. *See Sony*, 464 U.S. at 449–50 (time shifting a justifiable use for taping television broadcasts); *Ty, Inc.*, 292 F.3d at 521 (collectors guide a justifiable use for photographs of an entire collectable toy product line). When the purpose of the use and the purpose of the work are the same, as they are here, there is no justification for making an entire copy of the work, and this factor cuts against fair use.

        **D.**     **Factor Four: Market Effect**

The fourth factor asks courts to consider the economic loss brought about by the copying, considering both "the amount but also the source of the loss." *Google,* 593 U.S. at 35. Copying which replaces or substitutes sales of the original work, much in the way that "nails are substitutes for pegs or screws" is less likely to be fair. *Ty, Inc.,*

10

292 F.3d at 517. Copying that supplements or displaces demand for the original work, such as a scathing review or biting parody, is likely fair. *Campbell*, 510 U.S. at 590–95.

Here, Gwinn argues that he had several potential licensing deals in progress on June 20, 2020, all of which disappeared after the defendants' press conference. (R. 47 at 13.) The defendants argue that the Gwinn's inability to sell any licenses for his news footage between June 17 and June 20 demonstrates that there was no market for the Work. (R. 42 at 9–10.) The sole evidence either side presents is the direct/instant messages from news producers seeking to license the Work. (R. 44-8). Neither side places before the Court follow-up evidence as to why none of the potential licenses turned into executed licenses. Without an evidence-based explanation, the Court is left with *post hoc* argumentation—that because Gwinn's failure to license came after the press conference, his failure to license is because of the press conference. Such arguments are improper. *Aluminum Recovery Techs., Inc. v. ACE Am. Ins. Co.,* 94 F.4th 561, 563 (7th Cir. 2024). The defendants have also failed to demonstrate their case: without additional evidence, a lack of sales by Gwinn could demonstrate a lack of market for the Work, or the complete destruction of that market by the defendants' copying. Because the parties' arguments are made in the absence of evidence, the Court is unable to judge who is correct. The Court thus finds that this factor is neutral.

### E. Fair Use Conclusion

Two of the fair use factors favor Gwinn, one favors the defendants, and one is neutral. However, adjudicating fair use requires more than merely tallying factors.

11

As noted, the enumerated factors are not exclusive, and the Court is mindful of the Supreme Court's guidance that "some factors may prove more important in some contexts than in others." *Google,* 593 U.S. at 19. Here, the Court concludes that the first factor is the determinative factor. The defendants copied the Work for the exact purpose it was created to serve. This dominates the fair use analysis and compels the Court to conclude that the defendants' actions do not constitute fair use. At the end of the day, the defendants took news footage and used it to "officially comment on, encourage news reporting of, and inform the public about the Protest and its resulting public safety," or, in short, to report the news. (*See* R. 44 ¶ 12; *see also* R. 42 at 7 ("[t]he Compilation was then shown at a CPD Press Conference for the purpose of news reporting. . .").) The defendants' use of Gwinn's Work was not fair use. Accordingly, the unrefuted evidence that the defendants copied Gwinn's Work without Gwinn's authorization entitles Gwinn to summary judgment. (*See* Pl.'s Resp. DSOF ¶ 56.) Gwinn's summary judgment motion is granted and the defendants' motion is denied.

## II.    COUNT II: REMOVAL OF CMI

The parties also move for cross-summary judgment on Count II. Gwinn alleges that when the defendants incorporated his Work into the Compilation, they removed it from the Twitter post the Work was originally attached to, violating 17 U.S.C. § 1202(b). (Compl. ¶¶ 50–58.) CMI is defined as, *inter alia*, the title, author, copyright holder, and other identifying information about a work, conveyed in connection with a copy of the work. 17 U.S.C. § 1202(c). The law forbids the (1) intentional,

unauthorized, removal of CMI, (2) distribution of CMI known to be altered, or (3) distributing works with CMI that is known to be removed or altered, while knowing or "having reasonable grounds to know" that such actions "induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b).

The defendants argue that they cannot be liable under § 1202(b) for two reasons. First, they argue that the Twitter post ("tweet") does not qualify as CMI, and second, that Gwinn cannot show they acted with the double scienter required by § 1202(b). (R. 32 at 12.)

The Court starts with whether the tweet qualifies as CMI. CMI is defined by § 1202(c) to be, as relevant here, the name of the author and copyright owner of a work. Gwinn argues that by posting the Work to Twitter using the account "@DominicGwinn," which also displays the username "Dominic Gwinn," he was posting the Work alongside CMI identifying the author and copyright owner of the Work. (R. 34-1 at 14–15.) The defendants argue that neither the account name nor username qualify as CMI. (R. 32 at 12.)

Whether a tweet containing a work is CMI is a novel question which only one other court has had the opportunity to grapple with. *See Agence France Presse v Morel*, 2010 U.S. Dist. LEXIS 139103, at *22–25 (S.D.N.Y. Dec. 23, 2010). In *Morel*, the Southern District of New York concluded that a Twitter account name and username as part of a tweet could be CMI for a photograph, concluding it was "implausible that a viewer of [the] photos would not understand the designations . . . appearing next to the images to refer to authorship." *Id*. The defendants argue that

13

because the *Morel* ruling was on a motion to dismiss, not a motion for summary judgment, it is inapposite, (R. 49 at 14), but the court there did not revisit its conclusion at summary judgment. *See Agence France Presse v. Morel*, 934 F. Supp. 2d 547, 575 (S.D.N.Y. 2013), *rev'd on reconsideration as to damages only*, 934 F.Supp.2d 584 (S.D.N.Y. 2013). The Court is therefore comfortable considering *Morel* for its persuasive value.

The plain text of § 1202 supports Gwinn's position as well. CMI is "information conveyed in connection with copies" of a work. 17 U.S.C. § 1202(c). Nothing requires the CMI be affixed to, as opposed to appearing near, a copy of a work. And courts considering the issue have held that photo credits printed near a photograph (known as "gutter credits") qualify as CMI. *See Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 305 (3d Cir. 2011); *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 172 (2d Cir. 2020). This Court is persuaded that Gwinn's username and actual name appearing at the top of the tweet containing the Work is "information conveyed in connection with" the Work, analogous to a gutter credit. Therefore, the tweet qualifies as CMI.

Next, the Court turns to whether § 1202(b) has a "double scienter" requirement, and if so, whether the defendants had that double scienter when they created the distributed the Compilation.

The Seventh Circuit has not ruled on whether § 1202(b) has a double scienter requirement, but the Second, Ninth and Eleventh Circuits have concluded that it does. *Mango*, 970 F.3d at 172.; *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018); *Victor Elias Photography, LLC v. Ice Portal, Inc.*, 43 F.4th 1313, 1319 (11th

14

Cir. 2022). Furthermore, courts in this district that have considered the issue have embraced this approach. *See GC2 Inc. v. Int'l Game Tech., IGT, Doubledown Interactive LLC*, 391 F. Supp. 3d 828, 840 (N.D. Ill. 2019); *Nucap Indus., Inc. v. Robert Bosch LLC*, No. 15 C 02207, 2019 WL 4242499, at *12 (N.D. Ill. Sept. 7, 2019), *rev'd on reconsideration for evidentiary reasons,* No. 15 C 02207, 2020 WL 13645506 (N.D. Ill. Aug. 23, 2020). The Court sees no reason to disagree with these conclusions. The law as written contains two separate "knowing" (or intent) provisions—one for the removal or modification of CMI (or the distribution of a work without proper CMI), and one for the inducement, etc., of infringement. As the Eleventh and Ninth Circuits persuasively reasoned, the double scienter requirement is the only interpretation of this statutory language that avoids rendering one of these provisions superfluous. *See Stevens*, 899 F.3d at 666; *Victor Elias Photography*, 43 F.4th at 1319 (citing *Stevens*).

The defendants argue that no reasonable jury could conclude that the evidence shows they acted with the requisite intent because the evidence supports concluding that the defendants did not intentionally remove CMI or "encouraged further distribution of the CMI-lacking Work." (R. 32 at 12.) This is not entirely correct. True, Brown escapes liability under the double-scienter requirement, because there is no evidence in the record that he played any role in creating the Compilation and thus could not have removed CMI. (Pl.'s Resp to DSOF ¶ 54). However, the City admits every fact needed to find it meets the double scienter requirement of § 1202(b).

Specifically, the City admits that it accessed the Work from Twitter and added the work to the Compilation without attribution to Gwinn. (Def. Resp. PSOF ¶¶ 4–

15

6.) These admissions suffice to prove there is no material dispute that the City stripped the Work of CMI when its employees inserted the Work into the Compilation, and intentionally performed these actions. Nor is there a material dispute that the City emailed the Compilation to members of the press, uploaded a recording of the press conference (including the Compilation) to YouTube, and posted the Compilation to Twitter. (*Id.* ¶¶ 9–10; DSOF ¶¶ 1, 52.) At least one of these actions led to local news affiliates hosting their own copies of the Compilation, as part of a longer video of the press conference, a fact which the defendants brought to the Court's attention. (DSOF ¶ 1 n.1.) Therefore, there is no material dispute that the City's actions have induced, enabled, or facilitated further infringements of Gwinn's copyright in his Work. And the Court has no trouble concluding that the City, the third largest city in the country, had reasonable grounds to know its actions would lead to this result. As the City's Rule 30(b)(6) deponent testified, the City had a policy of complying with intellectual property rights when posting to social media. (R. 34-18 at 4-5.) The City should have been well aware of the potential consequences of failing to follow its own policy. Accordingly, Gwinn's motion for summary judgment on Count II is granted against the City while Brown's motion for summary judgment is granted and the City's is denied.

### III. DAMAGES

Now, the Court must consider the issue of damages. For both copyright infringement and removal of CMI, Gwinn may elect actual damages and additional profits from his infringer, or statutory damages. 17 U.S.C. §§ 504, 1203(c). Gwinn is

16

hereby ordered to notify the Court of his choice on or before April 18, 2025, and may simultaneously file supplemental briefing of up to five (5) pages as to the amount sought. The defendants shall respond, also in five (5) pages or less, on or before May 9, 2025. No reply is necessary. Each party shall indicate in its brief whether it seeks an evidentiary hearing or jury trial on damages and, if the latter, provide support for trying the issue of damages to a jury.

## CONCLUSION

The plaintiff's Motion for Summary Judgment [34] is granted as to Count I, and granted as to Count II against the City of Chicago. The defendants' Motion for Summary Judgment [31] is denied as to Count I, granted as to Count II for Brown, and denied as to Count II for the City of Chicago. The Court orders supplemental briefing on the issue of damages. The plaintiff's brief is due on or before April 18, 2025. The defendants' response is due on or before May 9, 2025. Supplemental briefing is limited to five (5) pages per side.

Date: March 31, 2025

JEREMY C. DANIEL
United States District Judge